SERENA MOSLEY-DAY
smosleyday@ftc.gov
REID TEPFER
rtepfer@ftc.gov
EDWARD HYNES
ehynes@ftc.gov
FEDERAL TRADE COMMISSION
1999 Bryan Street, Suite 2150
Dallas, TX 72501
Telephone: (214) 979-9390 (Mosley-Day)
Telephone: (214) 979-9395 (Tepfer)
Telephone: (214) 979-9381 (Hynes)

Local Counsel:
DAVID L. HANKIN (CA Bar No. 319825)
dhankin@ftc.gov
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Telephone: (310) 824-4317

*Attorneys for Plaintiff Federal Trade Commission*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>FITNESS INTERNATIONAL, LLC,<br>a limited liability company; and<br><br>FITNESS & SPORTS CLUBS, LLC,<br>a limited liability company.<br><br>Defendants. | Case No. 8:25-cv-1841<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.    The FTC brings this action for Defendants' violations of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and Section 4 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403. For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, and ROSCA, 15 U.S.C. § 8403.

## SUMMARY OF THE CASE

2.    Defendants Fitness International, LLC and Fitness & Sports Clubs, LLC (collectively "Defendants"), operate nationwide gym chains that use difficult cancellation procedures to prevent consumers from cancelling their memberships and other recurring charges.  As a result, Defendants have illegally charged hundreds of millions of dollars in unwanted recurring fees.

3.    Defendants enroll consumers in recurring monthly memberships with negative option features either on Defendants' websites or at Defendants' gyms. But to cancel these memberships, Defendants have required consumers to use one of two unfair and unlawful cancellation processes that are not simple and in fact are difficult, time-consuming, and inadequately disclosed to consumers.

4.    One of Defendants' restrictive cancellation mechanisms directs consumers to submit a difficult-to-access form in person, at the gym.  To cancel in person, Defendants have instructed consumers to first access their account on the gym's website, generate the cancellation form, and print it.  But to access and print this form, Defendants have required consumers to navigate to their website, which consumers rarely if ever use, and complete a cumbersome log in process which requires credentials that many consumers either do not have or do not remember.

5.    Defendants' instructions to consumers have provided that consumers must then take their printed forms to the gym during limited hours, search out and

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

find the specific manager at the location who is authorized to process the forms, and wait for that manager to process the consumer's cancellation. Consumers who have been unable to reach this manager could not cancel their membership through any of Defendants' other employees. Instead, they have been required to return another time and hope that the specific manager is available.

6. Another way Defendants have accepted cancellation is by mail. Defendants have instructed consumers to complete and print the same cancellation form. But to obtain the form consumers must access and log in to Defendants' website, which poses the obstacles alleged above, and then mail it at their expense. However, Defendants instruct consumers to use certified mail or registered mail, either of which requires a trip to the post office and additional costs.

7. Each of these cancellation methods is opaque, complicated, and demanding—far from simple. In particular, Defendants have not adequately disclosed how to cancel when consumers are signing up for their memberships and have presented different, often contradictory, cancellation requirements during sign up, in membership agreements, and on the Defendants' websites.

8. In selling their memberships, Defendants also frequently sign consumers up for additional services with recurring charges, such as towel service or childcare, using the same membership contract. However, Defendants impose different and inconsistent cancellation requirements for these additional services. Further, Defendants have failed to disclose that the additional programs and features are separate negative option programs, distinct from their base memberships, which consumers could cancel independently, often through less difficult means. As a result, Defendants have misrepresented that these additional negative option programs and features, along with their base memberships, are part of a single membership.

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

9.      Many consumers who comply with Defendants' restrictive cancellation procedures nevertheless find that they continue to be billed for their memberships.

10.     Defendants have received tens of thousands of reports from consumers complaining that their cancellation practices are difficult.  Consumers also have filed thousands of reports complaining about Defendants' cancellation practices with consumer groups and state and federal authorities.  Nevertheless, for years, Defendants have consistently failed to provide a simple cancellation method.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

12.     The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces ROSCA, 15 U.S.C. §§ 8401-05, which, *inter alia*, prohibits businesses from charging or attempting to charge consumers for any goods or services in a transaction effected on the Internet through a negative option feature without meeting certain requirements to protect consumers.  A negative option is an offer in which the seller treats a consumer's silence—*i.e.*, their failure to reject an offer or cancel an agreement—as consent to be charged for goods or services.  16 C.F.R. § 310.2(w).

## DEFENDANTS

13.     Defendant Fitness International, LLC ("FI"), also doing business as LA Fitness, is a California limited liability company with its principal place of

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

business at 3161 Michelson Drive, Suite 600, Irvine, CA 92612-4406. FI transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, FI has advertised, marketed, distributed, or sold gym memberships, personal training memberships, and associated services and amenities to consumers throughout the United States.

14.    Defendant Fitness & Sports Clubs, LLC ("F&SC"), also doing business as LA Fitness, is a Delaware limited liability company, with its principal place of business at 3161 Michelson Drive, Suite 600, Irvine, CA 92612-4406. F&SC is a wholly owned subsidiary of FI. F&SC transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, F&SC has advertised, marketed, distributed, or sold gym memberships, personal training memberships, and associated services and amenities to consumers throughout the United States.

## COMMON ENTERPRISE

15.    Defendants have operated as a common enterprise while engaging in the violations of law alleged below. Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, office, and retail locations. Because these Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

## COMMERCE

16.    At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### Overview

17.    Defendants operate gyms across the United States and in Canada

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

under the brand names LA Fitness, Esporta Fitness, City Sports Club, and Club Studio. Defendants have more than 600 locations and over 3.7 million members in the United States.

18. Defendants offer health and fitness services to consumers through their brand locations. These services are offered through a base gym membership with optional add-on services. Under the base gym membership, the consumer initially pays the first and last month's dues, followed by recurring monthly dues, in addition to recurring annual fees. Gym membership monthly prices vary widely, including from $30 to $50 for an LA Fitness membership and as much as $299 for other brands. The recurring annual fees range from approximately $40 to $60.

19. In addition, Defendants offer a variety of other optional services through negative option programs. For example, Defendants offer personal training memberships, which have fixed initial terms generally ranging from six to twelve months, followed by a recurring monthly membership until consumers cancel. Defendants also offer more than 50 add-on services and amenities on a negative option basis that range in price from $5 monthly fees for towel service to $249 monthly subscriptions for cryotherapy.

**Defendants' Gym and Personal Training Membership Enrollment Practices**

20. Consumers can sign up for Defendants' gym memberships on one of Defendants' gym brands' websites by clicking a prominent "Join Now" tab. On the following pages, consumers can select their plans, enter their billing information, and then confirm their membership and enrollment.

21. After providing their contact and payment information, prospective members review and confirm their membership. Although consumers have been able to elect to preview their membership agreement prior to processing the enrollment, they could do so only by clicking an inconspicuous, gray button.

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

22. Defendants also allow consumers to sign up for memberships at their gym locations. Each location employs sales staff for the purpose of enlisting new members.

23. Sales staff direct consumers through the signup process using the Defendants' Sales Management Tool app, which captures the sale information, including payment information.

24. After receiving the billing information, the app populates the membership agreement. Consumers initial and sign the agreement using an electronic signature pad. Consumers are able to see the agreement only after the sales staff collects and saves their billing information.

25. After consumers sign the agreement, Defendants' sales staff help them download Defendants' mobile app. Defendants provide consumers with a unique time-sensitive QR code, which automatically logs the consumer in to the Defendants' app. Through their mobile app, Defendants allow consumers to locate their nearest gym location, check in to a gym location upon arrival, book fitness classes and personal training sessions, and check in to fitness classes. Defendants encourage consumers to use and rely on their mobile app. Defendants do not similarly instruct staff to guide new members on how to use their website. Notwithstanding encouraging consumers to use the app and the many features available in app, consumers cannot cancel in app. Before concluding the sales session, Defendants prompt the consumer to book an appointment for a fitness assessment, which Defendants use as an opportunity to pitch a personal training program.

26. At the fitness assessment, Defendants' personal training staff offer consumers their personal training program, which they call their "Pro Results" program. This program provides personal training sessions at an additional, recurring cost.

27. As with general gym memberships, Defendants sell Pro Results

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

memberships through the Sales Management Tool app.

28.    Monthly dues for the personal training memberships range from $180 to $660 per month.  Consumers also pay one-time enrollment fees, processing fees, and initiation fees that usually range from $99 to $149.

29.    Personal training staff enter consumers' details in the Sales Management Tool app and then add the information required to process future recurring credit card or debit card payments to the file.

30.    As with the gym memberships, the app presents consumers with the personal training membership agreement on a screen.  The consumers initial and sign the agreement using electronic signature capture pads.

31.    The personal training agreements are generally for a term of six to twelve months with a negative option to convert to recurring monthly agreements. If consumers attempt to cancel before the end of the term, they must pay a fee equal to 50 percent of the remaining balance due through the end of the term.

## Defendants' Add-On Services and Amenities

32.    Defendants also offer over 50 additional services and amenities to their members, including childcare and towel service.  These are typically added to a consumer's account at signup for the gym or personal training membership. Defendants have failed to disclose that these services and amenities are separate negative option programs.  Defendants also fail to disclose that the cancellation process for these add-on services is separate from cancellation for gym or personal training memberships, *i.e.*, that a consumer can cancel add-on services through less onerous means than Defendants offer for general gym or personal training memberships.

33.    Instead, Defendants in many instances have represented to consumers that the add-ons are simply part of the general gym or personal training memberships, and that that the terms and the cancellation procedures for the added services and amenities are the same as for their general gym membership or

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

personal training membership.  Thus, many consumers do not understand that these add-ons can be canceled at any time, often through less onerous means, including through any employee at the front desk of Defendants' gyms.

### **Defendants' Complex and Exacting Cancellation Methods**

34.    For years, Defendants required consumers to use one of two complex and difficult processes to cancel gym memberships and personal training memberships: in-person cancellation or cancellation by mail.  Defendants required these cancellation steps for all consumers.  Defendants' cancellation methods have been restrictive in manner and accessibility.  Defendants have failed to clearly and conspicuously disclose these cancellation requirements to consumers, before collecting consumers' billing information, when they enroll in Defendants' gym memberships.

*Defendants' Restrictive In-Person Cancellation Policies and Practices*

35.    The first of the Defendants' two restrictive cancellation methods requires consumers to travel to the gym and cancel in person, with one specific employee.  Consumers must take several steps to satisfy Defendants' restrictive in-person cancellation practices.

36.    To begin the cancellation process, Defendants have instructed consumers to first log in to Defendants' website and print a cancellation form.  But many consumers are unfamiliar with Defendants' website because, as alleged above, Defendants actively encourage consumers to use their mobile app to locate their nearest gym location, check into a gym location upon arrival, book fitness classes, book personal training sessions, and check into fitness classes. Moreover, Defendants assist consumers, through the use of a QR code, in logging in to their mobile app.  Defendants do not similarly guide members on how to how to access, log in to, or use their website.

37.    Defendants have not offered their cancellation form through the mobile app, but instead have made it available only through their website.

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

Defendants further complicate downloading their cancellation form by not making the form publicly available on their website, instead requiring consumers to login in order to download the cancellation form.

38.     Consumers have been deterred from cancelling due to the login process to Defendants' website.  Because Defendants encourage consumers to use their mobile app rather than their website, consumers often either do not know, or do not recall, their website login credentials. Consumers who need to reset their unique login credentials often find it difficult because they need to provide the original email address used to establish the membership account, the "key tag number" assigned at signup, and the first five digits of the bank account or credit card number listed on the account to process a credential reset request.  Consumers frequently complain that, when attempting to cancel their memberships, they are unable to log in to Defendants' website.  Moreover, even consumers who have access to the required information cannot set up or reset their login credentials. One consumer reported: "If you don't have an existing online login, they make you enter your membership info, then say that they've sent you an email, but as of the writing of this complaint, I haven't received that email."

39.     Consumers who are able to log in to Defendants' website and locate their cancellation form must then print out a cancellation form.  However, consumers frequently do not have a printer at home, further complicating cancellation.  One consumer reported, "I don't have or use a printer and think this is just a way to keep deducting money from my account, hoping I will forget about it."

40.     Consumers who are able to log in and print out the cancellation form are directed to bring it to a brick-and-mortar gym location.  However, Defendants strategically limit in-person cancellations.  For example, they have accepted cancellation requests only between the hours of 9 a.m. and 5 p.m., Monday through Friday, even though their locations are generally open for as many as 19 hours per

10

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

day and generally are open 7 days per week.  Moreover, the restricted hours are limited to times when consumers are ordinarily working.  Indeed, a report to the Better Business Bureau observed, "To require the average person to come in person between 900-1700 (9-5pm) means you expect us to use PTO [personal time off]…."

41.    Defendants consistently directed consumers to use the specified form and did not clearly disclose that they allowed written notice containing substantially similar information, including the member "key tag number" and email used at sign up.  For example, the Membership Questions section of the City Sports Club brand has provided consumers who wish to cancel with these instructions:

> Club memberships with recurring dues may be cancelled by printing a cancellation form online.  Click on My City Sports Club. Login, click on Account Information tab and then click on the "Cancellation Form" option on the right side of the screen.  Mail the form to the address listed on the form.  We recommend you mail the notice by certified mail and keep a record for your files.  Or, you can deliver the notice directly to the Operations Manager at the nearest City Sports Club facility between 9AM and 5PM on Monday through Friday (the days and times for in-club cancellations are subject to change depending upon the availability of Operations Manager).  If you deliver the notice in person, please be sure to get a receipt for your records.

42.    To make the process even more difficult for consumers, Defendants have required consumers to submit their cancellation requests to only one employee, the Operations Manager.  Defendants have maintained this requirement even though, at each of their locations, Defendants have employed several additional consumer-facing operations staff at their front desks and two additional

managers in addition to the Operations Manager. Yet Defendants have not authorized any of these additional personnel to accept gym or personal training cancellation requests.

43.    One consumer described the difficulties these cancellation practices impose in a report to the Better Business Bureau:

> Since June 2022 [my son] has been trying to cancel his membership. He travels for work constantly, home only on Sundays, when he attempted to do it in person, they told him he had to see the operation manager (who apparently only works from 9-4 M-F, or mail a cancellation request [by] certified mail ( [sic] which requires him to go to the post office, again only open during his working hours. Neither of these options work for him. He has tried over and over when he was home, and the manager was not in.

44.    Even when consumers successfully navigate the myriad roadblocks to bring the form to a specific manager during the required hours to submit a cancellation request in person, in many instances, they have been unable to submit their cancellation requests. Specifically, consumers often have not been able to meet with the Operations Manager, even during the posted hours when the Operations Manager was supposed to be available. In fact, Defendants have conceded as much in the FAQ portion of their websites, stating, "the days and times for in-club cancellations are subject to change depending on the availability of the Operations Manager." Thus, as one consumer reported, "Every time I have attempted to [cancel in person], I have been told that the manager is not available and that there will be a follow-up. Unfortunately, there has never been any follow-up! This has been a recurring issue and it has left me feeling helpless and frustrated."

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

45.     When Defendants' Operations Manager has been unavailable, Defendants have not permitted other employees, including other front-desk staff, sales staff, and other managers, to process the consumers' membership cancellation requests.

*Defendants' Cumbersome Mail Cancellation Requirements*

46.     Until at least March 2024, the only alternative Defendants have offered nationwide to in-person cancellation has been to cancel by mail.  As with in-person cancellation, Defendants have required consumers cancelling by mail to navigate to and successfully log in to their website, locate their cancellation form, and print this form, involving the difficulties alleged above.  While Defendants accept written notice of cancellation for mail-in cancellation, they do not clearly and conspicuously disclose, before collecting consumers' billing information at enrollment, this option to consumers and fail to inform consumers of what information must be in the notice.  Defendants consistently advised consumers to use the specified form, and did not clearly disclose that they allowed written notice containing substantially similar information.

47.     In their instructions, Defendants have recommended that consumers who attempt to cancel by mail should send their requests by certified or registered mail.  Both options require that consumers go to a post office in-person and pay additional costs.

48.     Even if a consumer is able to navigate all of the above steps, Defendants frequently do not process cancellation requests submitted by consumers by mail.  As one consumer reported:

> The company requires that you mail in a cancelation form.  I have mailed multiple forms.  The first couple I mailed were apparently 'not received'[.] [C]ustomer service would not allow me to cancel the membership any other way so I have mailed 3 more cancelation forms via certified mail and I have proof of tracking for all 3 showing

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

delivered and the company is still charging me for membership and will not cancel the membership.

49.     Yet another consumer reported sending—and paying for—three certified letters to end their personal training membership over four months, only to find that they continued to be billed for that membership.

50.     And even when Defendants have processed mailed-in cancellations and sent confirmation notices to consumers, in some instances, they have continued to charge consumers without their permission.

*Defendants Have Required Separate Cancellation of Each Negative Option*

51.     Defendants have further complicated cancellation by not allowing consumers to cancel entire accounts through a single form when those accounts include multiple negative option memberships.  Rather, Defendants have required that consumers cancel each membership by a separate form.  Thus, for example, for family add-on accounts, where one individual pays for multiple members, consumers have been required to submit forms for each family member.  This requirement, when added to Defendants' cumbersome cancellation requirements, has ensured that even consumers who are able to cancel one recurring membership often continue to be billed for another.  These consumers have often found that they lack recourse to cancel the memberships for which Defendants continue to bill them.  As one consumer reported:

My personal trainer cancellation went through but my membership did not.  Now I no longer have my details to log onto the website and every time I call I get put on hold and told I just have to print the form and send it in.  I cannot do this because I don't have my info anymore and they [can't] be bothered to help me get it.  I don't think this is the branch per se since I keep getting referred to corporate[.] I'm writing this after getting of the phone with them again where after explaining the situation I was promptly told call back tomorrow and hung up on.

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

52.     Defendants' cancellation practices also have been inconsistent across their negative option programs.  While Defendants have required consumers to complete the cancellation requirements detailed above for gym and personal training memberships, consumers could cancel add-ons by simply visiting the front desk and speaking to any front desk attendant.  However, Defendants do not disclose this cancellation method in writing anywhere.

*Defendants Deny Escalated Cancellation Requests*

53.     Rather than simplifying their cancellation practices, for years Defendants have instead employed a team of staff to refuse membership cancellation requests that consumers escalate via telephone or email.

54.     When consumers call or email Defendants' corporate headquarters, those communications are assigned to management staff at individual club locations for response.  Defendants receive more complaints by telephone and email related to cancellation than to any other issue.

55.     Rather than simply processing these escalated cancellation requests, Defendants have directed the managers to refuse them through prepared scripts. These scripts direct consumers to follow the cancellation process, *e.g.*, in person or by mail, alleged above even though Defendants give these managers the ability, within their computer systems, to cancel consumers' memberships.  However, Defendants authorize these managers to process cancellations only in-person, when submitted pursuant to Defendants' policy.  Defendants prohibit these same managers from processing cancellations that are submitted by email.  Such emails include submissions that expressly state that consumers were unable to cancel pursuant to Defendants' policy.

56.     In many cases, Defendants' directions add insult to injury for consumers who are complaining to Defendants' headquarters only after submitting cancellation requests according to Defendants' instructions without success. Defendants' scripts state that consumers must follow the restrictive cancellation

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

processes, implausibly, in order "[t]o protect the privacy of our members." As one consumer noted, "There's no privacy protection for members, you guys just want to make it difficult."

57.    In contrast to how Defendants treat direct consumer complaints, when Defendants receive a Better Business Bureau or state attorney general complaint, their staff work to quickly resolve the matter. In these circumstances, Defendants cancel memberships without requiring that their onerous procedures be followed, provide refunds, and waive termination fees for personal training. Defendants' responses to state attorneys general generally report that Defendants have resolved the matter with the consumer and attempt to explain the cancellation policy by reassuring, "This cancellation policy is not designed to make it difficult for our members to cancel, but rather to ensure cancellations are handled properly."

58.    Defendants have continued to impose these complicated and onerous cancellation requirements on consumers nationwide despite adopting different practices in the limited number of states that require specific simpler means of cancellation for gyms, such as cancellation by email or online.

*Defendants Aggressively Override Consumers' Attempts to Cancel their*
*Memberships through their Banks and Credit Cards*

59.    Consumers who are unable to cancel through Defendants' complicated cancellation options and cannot obtain relief through an escalated request often contact their bank or credit card company to try to shield their accounts from Defendants' automatic recurring payments. But Defendants deploy aggressive tactics to continue rebilling even these desperate consumers, including by billing new account numbers. As one consumer reported, "on June 6 [Defendants] tried to use my old card and it was declined. Then on June 8 they hit my new card. I didn't give them the new card…."

60.    Defendants' cancellation practices have caused hundreds of millions of dollars in consumer harm. Consumers were not able to avoid this harm because,

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

as alleged above, Defendants have not clearly disclosed how to cancel.  Consumers who joined Defendants' gyms had no choice but to endure Defendants' cumbersome practices if they wanted to cancel their membership.

61.    Neither the imposition of the exceedingly difficult cancellation methods nor the failure to clearly disclose them is outweighed by benefits to consumers or competition.  There are no benefits to unnecessarily onerous cancellation procedures, and Defendants have provided alternate cancellation methods in the states where required by state law.  For years, Defendants were able to offer less onerous cancellation methods to all their consumers but chose to withhold them.

62.    Not until eight months after receiving a Civil Investigative Demand from the Commission did Defendants begin to offer website cancellation for their subscriptions with stand-alone agreements.  Defendants still do not permit consumers to cancel through their mobile apps.

63.    However, Defendants' online cancellation mechanism still imposes unnecessary burdens on consumers.  For example, to cancel online, consumers still must log in to Defendants' website, requiring them to identify and potentially reset their login credentials, which is often difficult, as alleged above.  Then, they must navigate to the cancellation tab and select an option to cancel their membership.

64.    In addition, Defendants continue to bury any mention of the online cancellation method during website enrollment, mentioning it only after the two more cumbersome methods and before language regarding specific state cancellation methods. Finally, when Defendants respond to consumers or consumer entities regarding cancellation complaints, they often do not mention online cancellation as an option.

65.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things: Defendants' practices

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

remained unchanged for months after receiving a Civil Investigative Demand from the Commission; Defendants changed their cancellation procedures only after learning of the Commission's investigation; Defendants engaged in their unlawful conduct repeatedly over many years and continued their unlawful conduct despite knowledge of thousands of consumer complaints; and Defendants remain in the business of health and fitness clubs and are expanding their presence in the market and therefore maintain the means, ability, and incentive to resume any unlawful conduct which has ceased.

## VIOLATIONS OF THE FTC ACT

66.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

67.    Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

## COUNT I

### Unfair Cancellation Practices

68.    In numerous instances, as described in paragraphs 17 through 65 above, Defendants' unreasonable cancellation practices have made it difficult for consumers to cancel memberships and other recurring charges.

69.    Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

70.    Therefore, Defendants' acts or practices as described in Paragraph 68 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

## VIOLATIONS OF
## THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

71.     In 2010, Congress passed ROSCA, 15 U.S.C. §§ 8401-05, which became effective on December 29, 2010.  Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce.  To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business."  Section 2 of ROSCA, 15 U.S.C. § 8401.

72.     Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310(w), unless the seller: (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express informed consent before making the charge; and (c) provides simple mechanisms to stop recurring charges. *See* 15 U.S.C. § 8403.

73.     The TSR defines a negative option feature as: "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

74.     As described in Paragraphs 17 through 65, Defendants have created and manage scores of negative option features as defined by the TSR, 16 C.F.R. § 310.2(w), including general gym memberships, personal training membership, and related services and amenities.

75.     Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404(a), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of ROSCA constitutes

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Violation of ROSCA—Inadequate Disclosures

76.    In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 17 through 65, above, Defendants have failed to clearly and conspicuously disclose all material terms of the transaction, before obtaining the consumer's billing information, including:

      a.  the method of cancellation; and

      b.  that their add-on services and amenities are separate negative option programs that are subject to separate cancellation requirements.

77.    Therefore, Defendants' practices as set forth in Paragraph 76 are violations of Section 4 of ROSCA, 15 U.S.C. § 8403(1), and are therefore violations of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

### Violation of ROSCA—Failure to Provide Simple Cancellation Mechanism

78.    In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 17 through 65, above, Defendants fail to provide simple mechanisms for a consumer to stop recurring charges for the good or service to the consumer's credit card, debit card, bank account, or other financial account.

79.    Defendants' practices as set forth in Paragraph 78 are violations of Section 4 of ROSCA, 15 U.S.C. § 8403(3), and are therefore violations of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C.

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

§ 8404(a), and therefore constitute an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. §45(a).

## CONSUMER INJURY

80.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of Section 5(a) and ROSCA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

A.     Enter a permanent injunction to prevent future violations of Section 5(a) of the FTC Act and ROSCA by Defendants;

B.     Award monetary and other relief within the Court's power to grant;

C.     Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated:    08/20/2025

SERENA MOSLEY-DAY
REID TEPFER
EDWARD HYNES
Federal Trade Commission
1999 Bryan Street
Suite 2150
Dallas, TX 72501
(214) 979-9390;
smosleyday@ftc.gov (Mosley-Day)
(214) 979-9395;
rtepfer@ftc.gov (Tepfer)
(214) 979-9381;
ehynes@ftc.gov (Hynes)

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DAVID L. HANKIN
Federal Trade Commission
10990 Wilshire Boulevard
Suite 400
Los Angeles, CA 90024
(310) 824-4317
dhankin@ftc.gov

ATTORNEYS FOR PLAINTIFF
FEDERAL TRADE COMMISSION

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT,
AND OTHER RELIEF